A89A0612. MIMS v. THE STATE.
(382 SE2d 414)

BEASLEY, Judge.

Following the denial of his amended motion for new trial, Mims appeals his conviction and sentence for aggravated assault with intent to rape, OCGA § 16-5-21 (a) (1).

1. Appellant contends that the State failed to prove his identity as the perpetrator of the offense beyond a reasonable doubt.

The evidence viewed so as to uphold the verdict, *Thomas v. State*, 175 Ga. App. 873, 874 (1) (334 SE2d 903) (1985), showed that at approximately 3:00 p.m. on September 19, 1986, Jones was driving west on Georgia Interstate 16 towards Macon. She was in the right hand lane when a tractor-trailer truck pulled in front of her and slowed down. Jones moved into the left lane to pass the truck. She noticed the driver pointing out his window at her mini-van's right front tire. Jones went around the truck and got back in the slower right lane. When she did, the truck driver flashed his lights. Jones assumed there was something wrong with her tire even though she fairly recently had new tires put on the van. Jones pulled over into the emergency lane and the trucker pulled in behind her.

Jones and the trucker both exited their vehicles and the trucker came forward and kicked at Jones' tire. The trucker said the tire

seemed okay but that the lug nut should be checked. He asked if Jones had a tire iron. Jones did not want to bother with it so she told the trucker not to worry about it, that she would have it checked when she got home. The man said he had a screwdriver in his truck; he got it, came back and took the hubcap off. After checking the lug nuts, the trucker said the tire seemed all right. He could not get the hubcap back on. Jones said she would put it in the back seat and get it put back on when she got home. Jones had her car keys in her hand. When she went to unlock her passenger door to put the hubcap in, the truck driver grabbed her and pushed her down into the passenger seat.

The trucker pushed his hand up Jones' dress and down into her panties. Jones started screaming and trying to fight back. Jones' right hand was pinned down but she reached over with her left hand and was blowing the horn trying to get the attention of a passerby. Cars did go by but apparently did not realize what was transpiring because it was taking place on the very far right side of the road.

The trucker kept making sexually offensive statements. As Jones was still hitting the horn, the driver said, "if you're not good, I'll put you in the back of the truck." So Jones stopped blowing the horn. The man then inserted his finger in Jones' vagina and discovered that she was menstruating. The man decided to let Jones go.

Jones closed the door as fast as she could and went over to the driver's side. During the struggle her radar detector had become unplugged; in her nervousness, she reached up to plug it back in. The trucker saw her doing that and pointed his finger at Jones not to do that. Jones immediately took off going as fast as she could. Jones lived in Florida and was not familiar with the area. She did not want to stop anywhere on I-16 because she did not know if the trucker was following her. The only place she knew to stop was the weigh station in Forsyth on I-75. She went through Macon but did not stop because she did not know the neighborhoods and wanted to go somewhere where she felt safe. The weigh station was closed up, hoping that a policeman would pull her over, she drove extremely fast to her mother's house in Rockdale County where she reported the incident to the county police.

Jones was able to give a description of her attacker and of the truck. She had been in arm's length to the attacker, it was daylight and sunny during the attack, and the attacker did not have any kind of mask on his face. The description fit that of Mims and his rig.

Approximately three weeks later, Jones positively identified Mims as her attacker in a photographic line-up. When first looking at the photographs she said it was harder than she thought it was going to be and that she wanted to be certain that she identified the man that attacked her and not anyone else. At trial she testified that she

"also said something along the lines of, if I had to pick one, this would be him. That's what I said when I initially selected him. But then the more and more I looked at it, the more and more definitely sure I became. And seeing him in the courtroom, I'm, you know, even more sure." She further stated that there was no way she could forget the face of the man that attacked her. In the courtroom she identified Mims as her assailant.

Evidence of three similar transactions was introduced. Two of the female victims in those transactions testified and positively identified Mims as their attacker.

The evidence was sufficient to enable any rational trier of fact to find Mims guilty of the aggravated assault with intent to rape beyond a reasonable doubt. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. It is contended that a mistrial should have been granted because the GBI agent's testimony violated defendant's Federal and State Constitutional rights to remain silent and not incriminate himself and secondly, to have a fair trial, i.e., one without an expression of opinion that no defense had been presented at a previous trial.

On redirect, the agent was asked about his attendance at prior court proceedings adjudicating similar transactions involving Mims, evidence of which had already been presented. The State: "And in all these cases the Defense used was what? Identity or that he did it and had some excuse[?]" Agent: "I never really saw a defense unless it would be identity. There was never a statement that he did —"

Defendant objected and asked for a mistrial. This was denied after the court instructed the jury to disregard any statement the agent might have made in response to the last question. Defendant made no further objection.

"If defendant was not satisfied with the court's action in response to the [allegedly] improper . . . [statements by the agent], it was incumbent upon him to renew his objection and motion for mistrial. His failure to do so precludes his complaint on appeal. [Cits.]" *Delaney v. State*, 154 Ga. App. 772, 773 (1) (270 SE2d 48) (1980); see also *Copeland v. State*, 160 Ga. App. 786, 788 (6) (287 SE2d 120) (1981).

3. Appellant contends that the trial court erred in denying his motion in limine and admitting testimony of the GBI agent relating Mims' statements regarding a previous transaction for which he had been charged and acquitted of kidnapping and rape. He maintains that there was no lawful purpose for the introduction of the prejudicial statements.

The agent testified that Mims stated to him that "he was driving down I-16 interstate and [the alleged victim] waved him over and then offered him sex for the amount of fifty dollars," and that "he did have sexual intercourse with [the alleged victim], but he did not pay

her the fifty dollars."

The Supreme Court has not adopted a per se rule prohibiting evidentiary use of independent offenses where an acquittal was obtained. "Instead, 'the application of collateral estoppel requires an examination of what facts were in issue and necessarily resolved in the defendant's favor at the first trial.' [Cit.]" *Salcedo v. State*, 258 Ga. 870 (376 SE2d 360) (1989).

Identity was the issue in the crime on trial. In the subject other transaction, consent rather than identity was apparently the determinative issue. The State was not attempting to address consent or lack thereof because it was not an issue in this trial, although it had figured in the previous acquittal. *Salcedo*, supra. The acts for which Mims was acquitted, like the two other transactions, involved women traveling alone on Interstate 16 who were flagged down by a truck driver fitting Mims' description, were told by the trucker that the right front tire was wobbling, and were attacked by the trucker when they stopped for assistance. Evidence of the similar incident was admissible for the limited purposes of showing Mims' modus operandi, bent of mind, and lustful disposition. OCGA § 24-3-2; see *Felts v. State*, 154 Ga. App. 571 (2) (269 SE2d 73) (1980).

4. Appellant urges that the charge regarding presumption of truthfulness in reconciling witnesses' inconsistent testimony is constitutionally infirm because it negates the presumption of innocence and is burden shifting.

The court charged: "If upon a consideration of the evidence in this case, you find that there is a conflict in the testimony of the witnesses or a conflict between a witness or witnesses; it is your duty to settle this conflict if you can, without believing that any witness has made a false statement. When witnesses come and testify in Court, they are presumed to speak the truth. But if you can not reconcile the conflicts, if you find there are some, then it would be your duty to believe that witness or those witnesses whom you think is entitled to your belief. It if for you alone to determine what testimony you will credit and what testimony you will discredit."

The Supreme Court has agreed that "the presumption-of-truthfulness charge can be misleading and is of little positive value" and has recommended that its use be discontinued. *Noggle v. State*, 256 Ga. 383, 386 (4) (349 SE2d 175) (1986). The court also in that case determined that the charge is not unconstitutional as appellant proposes.

5. Appellant contends that flight should not have been charged because there was no evidence of it. There was evidence by inference that Mims left the scene of the assault. Further, the agent Golden testified that Mims attempted to escape from jail after being advised he would be in a line-up for the victim to identify her assailant. The

charge on flight was authorized. See *Johnson v. State*, 148 Ga. App. 702 (1) (252 SE2d 205) (1979).

*Judgment affirmed. Carley, C. J., and McMurray, P. J., concur.*

DECIDED MAY 22, 1989.

*Larsen & Flanders, H. Gibbs Flanders, Jr.,* for appellant.

*Beverly B. Hayes, District Attorney, Tyson Blue, Assistant District Attorney,* for appellee.